United States District Court
Eastern District of North Carolina
Eastern Division

Michael Murphy,                          )
                                         )
          Plaintiff,                     )
                                         )
          v.                             )          <u>Complaint</u>
                                         )
Aetna Life Insurance Company,            )
                                         )
          Defendant.                     )
_____  )

Plaintiff Michael Murphy alleges the following for his complaint against

defendant Aetna Life Insurance Company ("Aetna").

<u>Nature of Controversy</u>

1.      Mr. Murphy worked as an area sales manager for Performance Food Group

("PFG") until February 10, 2016. PFG provided long-term disability ("LTD") coverage

to Mr. Murphy and other eligible employees pursuant to an insurance policy issued by

Aetna bearing group policy number GP-809843 (the "Disability Policy"). The Disability

Policy obligates Aetna to make eligibility determinations and to pay policy benefits from

its funds. The Disability Policy does not grant Aetna discretionary authority. The

Disability Policy does not limit benefits due to subjective or self-reported symptoms.

2.      Mr. Murphy slipped and fell at work on January 24, 2012. The fall caused

Mr. Murphy pain, tingling, and numbness in his fingers, hands, shoulders, shoulder

blades, and neck. Mr. Murphy pursued treatment options and consulted with his medical

providers for years, but his pain persisted and became unbearable. On February 10, 2016,

Mr. Murphy underwent a four-level anterior cervical discectomy and fusion ("ACDF") at C4-C7 of his cervical spine and underwent an iliac crest bone graft. The procedure was intended to relieve Mr. Murphy's pain and numbness but it caused new, constant pain in his head, neck, and cervical spine, and exacerbated his existing pain and radiculopathy. Mr. Murphy became totally disabled and went out of work on February 10, 2016. Mr. Murphy satisfied the Disability Policy's 180-day elimination period and applied for LTD benefits. Aetna determined that Mr. Murphy was totally disabled from performing his own occupation and instated his LTD benefits effective August 10, 2016. Aetna terminated Mr. Murphy's LTD benefits effective January 26, 2018. Mr. Murphy appealed Aetna's decision on July 18, 2018. Aetna denied his appeal on November 14, 2018 and advised Mr. Murphy that he had exhausted his appellate remedies under the Disability Policy and he had the right to sue to recover benefits pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA").

3.      Mr. Murphy claims he is entitled to recover LTD employee benefits from Aetna pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. The relief Mr. Murphy seeks is reinstatement of his LTD benefits under the Disability Policy retroactive to January 26, 2018, prejudgment interest, monthly LTD benefits for as long as he remains entitled to benefits under the terms of Aetna's Disability Policy, and an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

<u>Parties, Jurisdiction, and Venue</u>

4.      Mr. Murphy is a citizen and resident of Craven County, North Carolina.

5.     Defendant Aetna is an insurance company and is authorized to conduct business in this state by the North Carolina Department of Insurance. Aetna is the Disability Policy's claims administrator.

6.     The Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 29 U.S. C. § 1132(e)(2) because acts and occurrences that give rise to Mr. Murphy's claim took place in this district.

<u>Additional Facts</u>

7.     Mr. Murphy is fifty-nine-years-old. He is totally disabled due to head, neck, and back pain, cervical radiculopathy, cervical and thoracic degenerative disc disease, and fibromyalgia.

8.     Mr. Murphy has an associate's degree in hotel, restaurant service, and food management. Mr. Murphy worked as a professional chef for approximately twenty years, before he was recruited to work in food sales. Mr. Murphy worked as an area sales manager at PFG for thirteen years. Mr. Murphy was well compensated for his expertise and earned approximately $204,500.68 per year, before bonuses and other incentives.

9.     The Disability Policy sets out the following definition:

**Test of Disability**
From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
- You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and
- Your earnings are 80% or less of your adjusted predisability earnings

After the first 24 months of your disability that monthly benefits are payable, you meet the plain's test of disability on any day you are unable

3

to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition. . . .

**Reasonable Occupation:**
This is any gainful activity:
- For which you are, or may reasonably become, fitted by education, training, or experience; and
- Which results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings.

Aetna determined that Mr. Murphy was totally disabled from performing his own occupation, which it categorized as a light strength duty occupation. Aetna also determined that Mr. Murphy could not earn 80% of his adjusted predisability earnings, which equates to $163,600.54 per year. The Disability Policy's own occupation standard of disability is the relevant standard for Mr. Murphy's claim for reinstatement of benefits.

10.     Mr. Murphy was excellent at his job and won awards, including salesman of the year. It was common for Mr. Murphy to earn an additional bonus of at least $20,000 each year in addition to other compensation, such as longevity incentives and all-expense paid trips for him and his family based upon his sales performance. Mr. Murphy had no reason, financial or otherwise, to prematurely end a lucrative career that gave him a great sense of pride.

11.     At PFG, Mr. Murphy was responsible for growing and maintaining sales revenue across North Carolina's coastal area. He traveled 75% of the time and worked in the field with Italian restaurant and pizzeria customers, often meeting in their restaurants and kitchens. PFG required him to give effective sales presentations, ensure customer satisfaction, provide an exemplary level of service, and perform any duty assigned to him to best serve PFG. Mr. Murphy lifted and carried 50 pound bags of flour, 50 to 60 pound

4

boxes of cheese, cases of tomatoes that weighed 30 pounds on average, and carried numerous files with him on the road. He had to navigate spaces that were not welcoming for a person with a fused spine and severe neck pain. To close deals, Mr. Murphy had to be patient, listen, effectively, communicate with the customer, understand the customer's business, convey confidence, and make the customer feel comfortable. Mr. Murphy had to do the same with his vendors who supplied him with products to sell to his customers.

12.    In the office, Mr. Murphy had to complete intellectually demanding tasks. He had to service a large contact list, analyze his sales territory, and effectively strategize. He used a computer and phone to complete many of his tasks, which required him to use fine motor skills to keyboard, use a mouse, dial a telephone, and hand write orders in the field with customers. PFG required Mr. Murphy to draw "correct and realistic conclusions based on data and information," which took a great deal of focus and insight. Mr. Murphy had to develop strategies, executive strategies in a timely fashion, and effectively evaluate his team's performance with careful reflection.

13.    In 2012, Mr. Murphy suffered a lifechanging fall at work. He was walking with a food vendor outside of a hotel, preparing to meet with prospective customers. He slipped on a wet, painted sidewalk and landed on his upper back and shoulders. The fall caused Mr. Murphy to experience pain, tingling, and numbness in his fingers, hands, shoulders, shoulder blades, and neck. Mr. Murphy persevered at work as best he could, but he quickly fell behind in the performance of his duties. Mr. Murphy pursued physical therapy, exercise, yoga, and other conservative treatments, all of which failed to provide

him with lasting pain relief. When conservative treatments failed, Mr. Murphy was referred to neurosurgeon Dr. Daniel Rose.

14.     On January 7, 2016, Dr. Rose examined Mr. Murphy. Dr. Rose's report states that Mr. Murphy had pain upon palpation in his paracervicals, trapezius, and rhomboid. Mr. Murphy's pain increased with extension of the spine. He could only flex 10 degrees to the left, 30 degrees to the right, and 40 degrees forward. Mr. Murphy had decreased sensation in his C6 vertebra, which caused numbness in his radial forearm, thumb, and index finger. Mr. Murphy had decreased sensation in his C7 vertebra, which caused numbness in his middle finger. Dr. Rose concluded that Mr. Murphy had "significant degenerative changes" at C5-C6 and C6-C7 and "severe left C6 radiculopathy" that had worsened since his 2012 fall. Dr. Rose stated that Mr. Murphy had completed physical therapy "without significant improvement." Dr. Rose ruled out epidural injections for treatment at C5-C6 because Mr. Murphy's spinal stenosis was so severe. Dr. Rose diagnosed Mr. Murphy with cervical radiculopathy and spinal stenosis. Dr. Rose discussed the risks and benefits of various surgeries and recommended an ACDF procedure at C4-C7 and an iliac crest bone graft.

15.     The same day, January 7, 2016, Dr. Rose completed an Attending Provider Statement for PFG. Dr. Rose informed PFG that Mr. Murphy needed to be out of work until May 20, 2016 due to cervical radiculopathy and stated that he would reevaluate Mr. Murphy on May 19, 2016.

16.     On February 10, 2016, Dr. Rose performed an ACDF at C4-C7 and an iliac crest bone graft on Mr. Murphy. To do this, Dr. Rose harvested bone from the iliac crest

6

in Mr. Murphy's hip. The operations caused Mr. Murphy to have new, constant pain in his head, neck, cervical spine, and hip, and exacerbated the existing pain, tingling, and numbness in his shoulders, arms, hands, and fingers.

17.     On March 31, 2016, Dr. Rose examined Mr. Murphy. Mr. Murphy was mildly tender to palpation in his cervical region. His range of motion was "extremely limited in all planes." Mr. Murphy had hypoesthesia to light touch in his C6 and C7 region, most notably on his left side.

18.     On May 19, 2016, Dr. Rose examined Mr. Murphy. The physical exam findings show that Mr. Murphy was mildly tender to palpation in his cervical spine and had surgical incision scars. His range of motion was "limited in all planes" and he had "increased radiation in the arms." His sensation associated with C6 and C7 was still diminished and caused numbness, most notably on his dominant left side. Dr. Rose stated, "The patient seems very anxious in general and overreacts to contact throughout the exam." Dr. Rose reviewed a cervical spine x-ray taken on the same day. Dr. Rose stated the x-ray showed good spinal position at the fusion cite from C4-C7. Dr. Rose stated that Mr. Murphy continued to have pain symptoms in his neck, iliac crest, and left arm. Dr. Rose ordered a CT myelogram scan, EMG, and nerve conduction study. Dr. Rose prescribed Mr. Murphy valium and told him to take it three times per day to control muscle spasms and anxiety. Dr. Rose's report shows that Mr. Murphy was also prescribed gabapentin, oxycodone, Percocet, and numerous other medications to treat his relentless pain. After the examination, Dr. Rose evaluated Mr. Murphy's work status at

Aetna's request. Dr. Rose wrote Mr. Murphy out of work until July 8, 2016 and stated he would reevaluate Mr. Murphy's condition at that time.

19.    On May 31, 2016, Mr. Murphy underwent a CT myelogram scan of his cervical spine. The CT scan showed mild dorsal osteophytosis at C4-C5, mild dorsal osteophytes in the left paracentral region of C5-C6 that caused narrowing of the central canal, mild dorsal osteophytosis at C6-C7, and possible minimal left foraminal narrowing.

20.    On June 14, 2016, Mr. Murphy underwent an EMG and nerve conduction study with Dr. Susan Vettichira. The test results were normal.

21.    Dr. Rose examined Mr. Murphy on July 7, 2016 and reviewed the CT scan and EMG study. Mr. Murphy reported muscle aches, muscle weakness, back pain, numbness, tingling, and anxiety. Upon examination, Mr. Murphy was tender to palpation in his cervical spine and his range of motion was limited "in all planes." He tested positive for Spurling sign, which was indicative of radiation in the left arm. He had decreased sensation to light touch on his left side that was associated with his C6-C7 vertebrae. Dr. Rose stated Mr. Murphy was "very anxious in general and overreacts to contact throughout the exam, which is true bilaterally." Under the heading "Assessment Plan," Dr. Rose wrote:

> I do not see any significant residual stenosis in the cervical spine. There are some mild remnant osteophytes which are greater on the left at C5-6, but do not appear to be significantly compressing the nerve root. He has some mild increase in pain with range of motion of the left shoulder. As a result we will perform a left subacromial injection to see if this significantly improves his symptoms. In addition I will order a left C5-C6 transforaminal steroid injection to see if this can selectively block his symptoms. He will

8

maintain a diary as to the relief he feels from either injection. If he does not receive any [improvement] from either of these, I do not have any further interventions that I would recommend.

After examining Mr. Murphy, Dr. Rose completed Aetna's Capabilities and Limitations Worksheet on July 18, 2016. Dr. Rose wrote Mr. Murphy out of work until he could give Mr. Murphy transforaminal epidural steroid injections ("ESIs"). On the worksheet, Dr. Rose listed cervical radiculopathy and subacromial bursa as Mr. Murphy's disabling diagnoses and listed oxycodone 10 mg as his ongoing medication.

22.     On July 20, 2016, Dr. Rose completed an Accommodation Request Assessment Form provided by Reed Group, PFG's FMLA and leave services administrator. Dr. Rose wrote that he had examined Mr. Murphy and Mr. Murphy needed to be out of work due to cervical radiculopathy and subacromial bursitis. Dr. Rose stated Mr. Murphy's impairment was not "open and obvious." Dr. Rose limited Mr. Murphy's lifting, reaching, and working abilities and stated Mr. Murphy's impairments limited his abilities to perform "all" essential functions of his own occupation at PFG. Dr. Rose wrote that Mr. Murphy should be afforded additional time out of work to pursue ESIs, pain management appointments, follow up appointments, and be given time to heal. Dr. Rose requested leave on Mr. Murphy's behalf until September 1, 2016.

23.     Dr. Rose completed another Attending Physician Statement provided by Aetna on August 4, 2016. Dr. Rose confirmed that Mr. Murphy was disabled due to cervical radiculopathy and that Mr. Murphy's physical status was unchanged. Dr. Rose wrote Mr. Murphy out of work until Mr. Murphy could undergo ESIs.

24.     Aetna hired a surveillance company, Claims Bureau, to surveil Mr.

Murphy. Claims Bureau sent its report to Aetna on August 8, 2016. The report indicates

that the investigator conducted surveillance of Mr. Murphy on July 28 and 29, 2016.

According to the report, on July 28, 2016, Mr. Murphy was observed departing his home

in the early afternoon, driving to a Planet Fitness in New Bern, and using an elliptical

machine for sixteen minutes. Mr. Murphy then left Planet Fitness, drove to a gas station,

and then returned home. The report states that the next day, July 29, 2016, Mr. Murphy

departed his residence in the mid-morning, drove to the Planet Fitness, where he used an

elliptical machine for twenty-five minutes, and then returned home. An Aetna claims

representative named Bobbi Smith reviewed the report and surveillance videos on August

9, 2016. Ms. Smith wrote:

> Not doing much except quick cardio on elliptical machine. Not using upper body on the machine. Very guarded left and right head movements when crossing the parking lot. . . .
>
> 10:52 video mark he lifts his arms up to the side not past his shoulders.
> 3:09 he completely turns his body to look to the side before crossing the street.
> 22:47 he scratches his head.
> 26:57 he scratches his head.
> 27:07 he rubs his face.
> 30:10 he completely turns his body to look to the side before crossing the street.

Ms. Smith concluded that the surveillance of Mr. Murphy's limited driving and

exercising indicated some functionality but was not contradictory of Mr. Murphy's

claimed restrictions and limitations.

25.     On August 10, 2016, Mr. Murphy became eligible for LTD benefits.

10

26.    On August 11, 2016, Ms. Smith interviewed Mr. Murphy. Ms. Smith's

report of the interview indicates that Mr. Murphy was exercising upon the advice of his

physician:

> He wants him to start physical therapy which is 45 min away
> He needs to do stuff at gym musculature side of the body have been
> protecting nerves and its like a defense mechanism and dr advice is to
> build physical therapy to break down the tension and muscles start
> thinking like muscles and then nerves will start healing and all his
> symptoms will start going away. unknown how long this will take. He told
> dr he does belong to the gym and he went to the trainer yesterday--one
> day of pulling, one day of pushing exercises, resistance on another day,
> legs and abs on another day. 4 sets of 15. start off with weight he can
> handle and then build up the weights to build up the muscles. nerves won't
> heal because of his posture and protective issues. obviously will be very
> painful process for him. Dr. said he had another patient with same
> problem and told him its possible. He was only doing elliptical and
> stretching on the stretch machine but will add weights in and follow dr
> advice.

Aetna's claim file notes indicate that Mr. Murphy's claim was reviewed by a Dr. Brodie.

According to the report of Debra Comar, a Senior Director at Aetna, Dr. Brodie agreed

with the clinical evidence that supported restrictions and limitations that would preclude

Mr. Murphy from performing his own occupation. Ms. Comar's report further states:

> Dr. Brodie was not optimistic that improvement would be realized given
> the number of levels involved in the spine but there is a chance.

27.    Aetna determined Mr. Murphy was totally disabled under the own

occupation standard of disability and began paying him LTD benefits. Aetna informed

Mr. Murphy of its decision through a letter dated August 16, 2016.

28.    On August 16, 2016, Mr. Murphy's pain intervention specialist, Dr. Francis

Pecoraro, gave Mr. Murphy a bilateral ESI at C5-C6. Under the heading,

"Assessment/Plan," Dr. Pecoraro wrote:

11

I instructed Mr. Murphy to exercise and strengthen his cervical musculature by performing pushing and pulling exercises. Mr. Murphy requested clarification of what kinds of exercises. He should not perform any above the head exercises. He should not push or pull more than 30 pounds. Mr. Murphy will follow up in 6 weeks to determine the outcome of the injection completed today.

29.     On August 19, 2016, Dr. Pecoraro completed Aetna's Attending Physician Statement and Capabilities and Limitations forms. Dr. Pecoraro confirmed that Mr. Murphy had degeneration of his cervical intervertebral discs. He wrote Mr. Murphy out of work until the next appointment, September 29, 2016.

30.     On September 29, 2016, Dr. Pecoraro's assistant, Jill McCulley, PA-C, examined Mr. Murphy. Mr. Murphy was tender to palpation on his left side, most notably in his paracervicals and trapezius. Ms. McCulley noted that Mr. Murphy's range of motion testing elicited pain. She stated Mr. Murphy had decreased rotation and pain with tilting to the right and left and stated that his range of motion was guarded. Ms. McCulley reviewed Mr. Murphy's medication list and recommended he continue using oxycodone, increase his gabapentin dosage to 400 mg four times per day, take Flexeril up to three times per day, recommended compounding cream and a home exercise program.

31.     On November 18, 2016, Dr. Rose examined Mr. Murphy. Dr. Rose found that Mr. Murphy had no lasting pain relief from the ESI. Mr. Murphy told Dr. Rose he had "pins and needles in his arms, fingers, and hands" that were worse on the left side than the right. Mr. Murphy told Dr. Rose that sitting is the "most painful position" and he feels radiating pain "when he tilts his head to read or watch television." Mr. Murphy told Dr. Rose that he has trouble getting out of bed some days due to pain. Dr. Rose reviewed

12

Mr. Murphy's May 31, 2016 CT scan again and diagnosed Mr. Murphy with neck pain and cervical radiculopathy. Dr. Rose recommended that Mr. Murphy stay out of work, and wrote that Mr. Murphy was "unable to work."

32.     On December 15, 2016, Dr. Rose examined Mr. Murphy. Dr. Rose stated Mr. Murphy had "continued pain primarily in his left arm." Dr. Rose said Mr. Murphy had "no relief" from the additional ESI he administered on July 7, 2016. Mr. Murphy said he was feeling "really crappy every day" and had "pins and needles in his arms, fingers, and hands, worse in the left." Mr. Murphy said his left arm and hand felt like they were "on fire." Mr. Murphy's pain levels in his right hand were 2 out of 10 to 5 out of 10 (10 out of 10 being the most severe), and 5 out of 10 to 10 out of 10 in his left hand. Sitting was the most painful position for Mr. Murphy and caused "radiating pain when he tilts his head to read or watch television." Dr. Rose recommended that Mr. Murphy seek a second opinion because Mr. Murphy continued to have bilateral radiculopathy. Dr. Rose wrote Mr. Murphy out of work and stated, "He has been unable to work since his last visit."

33.     On December 16, 2016, an Aetna representative, Thomas Best, wrote a claim file note that stated that Allsup, a social security disability vendor, agreed to accept Mr. Murphy's case for social security disability insurance ("SSDI") because Mr. Murphy "appears to be a good candidate for SSDI."

34.     On January 19, 2017, Dr. Pecoraro examined Mr. Murphy and gave him an ESI at C5-C6. Dr. Pecoraro diagnosed Mr. Murphy with cervical degenerative disc

13

disease, cervicalgia, and cervical radiculopathy. Mr. Murphy completed a pain

assessment and stated his pain was an 8 out of 10 in severity.

35.     On March 15, 2017, Gloria Garver, PA, examined Mr. Murphy at Dr.

Rose's request. Mr. Murphy presented with pain associated with cervical spine extension

and flexion. Mr. Murphy had decreased pinprick sensation at the levels of his C6 and C7

vertebrae, most notably on his left side. He had decreased sensation to vibration on his

right side at his C8 vertebra.

36.     On April 7, 2017, Jill McCulley, PA-C, examined Mr. Murphy. Her report

states that Mr. Murphy was tender to palpation on his left paracervicals and trapezius.

Under heading "Assessment/Plan," Ms. McCulley wrote:

> Patient is having chronic neck pain and daily headaches. He is not a
> surgical candidate. EMG/NCS upper extremities was normal. I
> recommend he proceed with cervical facet blocks as he has discussed
> with Dr. [Hagland], Dr. Pecoraro. . . . Patient cannot tell that the
> gabapentin is helping at all and he is complaining of a significant amount
> of nerve pain and hyperesthesias.  . . . I again recommend the patient find
> a doctor in New Bern to prescribe his pain medication, as this would
> require frequent visits and monitoring and he lives over 2 hours away.

37.     On May 23, 2017, LaNeshia Patrick, AGNP-C, examined Mr. Murphy. Mr.

Murphy was tender to palpation at C3-C7. He had pain with cervical extension, left

lateral flexion, left lateral rotation, and right lateral flexion. Under the heading

"Assessment and Plan," Ms. Patrick wrote:

> Assessment: chronic pain syndrome, cervical stenosis, history of cervical
> fusion, lumbar spondylosis, chronic prescription opiate use, cervical
> neuralgia, fibromyalgia . . . Start oxycodone 10 mg (1/2 tablet) PO BID pm
> for severe pain. Rx, instruction for nasal naloxone given . . . .
>
> The patient's symptoms were discussed at length as they pertained to the
> current pain situation. Medication will be considered. I discussed the fact

that the patient clearly has a number of concerning issues. Because of the longevity of their complaints and their significant impact upon the patient's quality of life, it is unlikely that a quick solution is available.

38.     On June 5, 2017, Dr. Pecoraro gave Mr. Murphy cervical facet injections at C3-C4, C4-C5, C5-C6, bilaterally. Mr. Murphy completed a pain assessment and stated his pain severity was 9 out of 10.

39.     On June 21, 2017, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy completed a PEG Three-Item Scale Assessing Pain Intensity and Interference questionnaire ("PEG questionnaire"). Mr. Murphy stated his average pain in the past week was 6 out of 10, his pain had interfered with his enjoyment of life 5 out of 10, and his pain had interfered with general activity 8 out of 10. Ms. Patrick examined Mr. Murphy. Mr. Murphy was tender to bilateral palpation at C3-C7. He had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion.

40.     On June 30, 2017, Dr. Pecoraro examined Mr. Murphy. Mr. Murphy was tender to palpation in his paracervicals and had pain with rotating and moving his cervical spine. Dr. Pecoraro noted that Mr. Murphy had ongoing radiation in his arms and numbness in his hands. Dr. Pecoraro deferred any additional spinal injections and encouraged Mr. Murphy to start an exercise program and work on proper posture and ergonomics.

41.     On August 24, 2017, Dr. Rose examined Mr. Murphy and reviewed updated x-ray images of Mr. Murphy's cervical spine. The x-ray images showed that Mr. Murphy's fusion had not loosened from a surgical standpoint. Dr. Rose reviewed a

second opinion from neurosurgeon Dr. Michael Hagland and agreed that Mr. Murphy

was not a candidate for "further surgical intervention."

42.     On August 22, 2017, the Aetna claims representative assigned to Mr.

Murphy's claim, wrote:

> 7/28/16 and 7/29/16 video surveillance- used elliptical machine but did not
> use the hand controls. Walked outside and turned body to the left and
> right to look before crossing. Did not move neck.

43.     On October 17, 2017, Ms. Smith wrote a report titled "Strategic Claim

Discussion." The participants in the discussion of Mr. Murphy's claim were Laurie

Bjorklund, Ms. Smith, Kim Shove, and Dr. Brodie. The report concludes with this

statement:

> Outcome: It is not evident at this time that the claimant would have
> sustainable capacity based on the medical. We will proceed with another
> round of independent observation to validate his activity level and follow
> up for his next office visit in November visit. If significant activity is found
> on surveillance, we will revisit in RMD.

44.     In November 2017, Aetna began its review of Mr. Murphy's claim in

anticipation of the change in disability definition from own occupation to any occupation.

This was almost one year in advance of the anticipated change, which was scheduled to

take place in August 2018. Ms. Smith's November 13, 2017 report indicates that Mr.

Murphy's "any occupation" wage was 60% of his adjusted annual salary of $204,500.64,

or $122,700.83. Ms. Smith's report indicates that three days of surveillance had been

planned.

45.     On November 27, 2017, Mr. Murphy underwent an x-ray of his thoracic

spine with Dr. Thomas Stohrer. Dr. Stohrer studied the x-ray and wrote:

Thoracic Discs T1-T12: Mild to moderate disc space loss at all thoracic levels. Small disc extrusions at all levels with small associated osteophytes most prominently in the lower thoracic spine. Mild spinal stenosis at T6-7. There is slight flattening of the left aspect of the spinal cord at this level but there does not appear to be definite cord impingement. . . .

Dr. Stohrer diagnosed Mr. Murphy with degenerative disc disease "throughout the thoracic spine." Dr. Stohrer wrote there was "mild spinal stenosis at C6-7 where there is some mild flattening of the left aspect of the spinal cord." Mr. Murphy also underwent an MRI of his thoracic spine the same day. Dr. Stohrer studied the MRI and found that Mr. Murphy had mild disc space loss, abnormal disc signal, moderate broad-based disc extrusion most prominently centrally, mild degenerative changes involving the facet joints with ligamentous and facet hypertrophy, mild spinal stenosis, moderate lateral recess stenosis on the left, and mild left neural foraminal narrowing at L4-L5. At L5-S1, Dr. Stohrer found that Mr. Murphy had severe disc space loss with abnormal disc signal, moderate-size broad-based disc extrusion most prominently on the right, mild degenerative changes involving the facet joints with ligamentous and facet hypertrophy, moderate lateral recess stenosis on the right, and mild bilateral neural foraminal narrowing.

46.     On November 30, 2017, Mr. Murphy underwent a sensory nerve conduction study with neurologist Dr. Cynthia Lopez. There were abnormal findings in the study that Dr. Lopez described as bilateral median mononeuropathies at or distal to the wrist (i.e. carpal tunnel syndrome).

47.     On December 12, 2017, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy was asked to rate his functioning on a scale of 0 to 10 (0 being non-functional,

17

10 being fully functional). He reported that his general activity score was 3, his mood was 4, walking ability 4, sleep 4, appetite 4, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an average of 8 out of 10, his pain interfered with his enjoyment of life 8 out of 10, and his pain interfered with his general activity 8 out of 10. Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at C3-C7, he had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr. Murphy to continue taking 5 mg oxycodone tablets three times per day for severe pain.

48.    Aetna hired Summit Investigations to conduct a second stint of surveillance. The investigator conducted surveillance of Mr. Murphy on December 21 through 23, 2017 and recorded 19 minutes and 58 seconds of video footage over three days. The investigator followed Mr. Murphy as he ran errands at the bank, grocery store, and two hardware stores. The investigator's video footage showed Mr. Murphy driving his Honda CRV short distances and parking in handicap parking spots. Mr. Murphy was recorded loading and unloading small grocery bags, a 20 pound bag of birdseed, two small bundles of firewood that weighed 18 pounds each, and a 29 inch fire pit in a box that weighed 27 pounds and was a Christmas gift for his girlfriend.

49.    On January 9, 2018, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy reported that his general activity score was 4, his mood was 2, walking ability 5, sleep 3, appetite 5, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an

average of 8 out of 10, his pain interfered with his enjoyment of life 8 out of 10, and his

pain interfered with his general activity at a level of "pain as bad as you can imagine."

Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at

C3-C7 and had pain in his facet joints. He had pain with cervical spine extension, left

lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr.

Murphy to continue taking 5 mg oxycodone tablets three times per day for severe pain

and to wean off of Cymbalta.

     50.     On January 12 through 14, 2018, Summit Investigations conducted

additional surveillance at Aetna's request. The investigator recorded eleven minutes and

four seconds of video footage over three days. Mr. Murphy was recorded taking one bag

of trash out to his trash can, driving to Craven Community College, and shopping for

groceries with his girlfriend. After grocery shopping, Mr. Murphy was recorded loading

two packages of bottled water separately and one dozen eggs in to his girlfriend's car,

who was driving. The packages of bottled water weighed approximately 26.5 pounds

each. Mr. Murphy's girlfriend loaded all other groceries.

     51.     On January 23, 2018, Ms. Smith wrote a report titled "Strategic Claim

Discussion." The participants in the discussion were Jerry Grunden, Dr. Brodie, Ms.

Smith, Kim Shove, and Debra Comar. The report concludes with this statement:

> Based on the surveillance and medical information available, the insured
> is active and lifting items greater than 20 lbs., such as a flat of bottled
> water where he stooped and lifted two cases of water, He also lifted a
> large bag of seed, two bundles of fire wood and a fire pit in a box. He also
> stooping while lifting these weights, using hands for grasping, gripping.
> Based on surveillance the insured appears to have the functionality to

perform his own occupation which is light in physical demand. Deny claim, refer to Hartford SIU.

Based on the surveillance, Aetna terminated Mr. Murphy's LTD benefits effective January 26, 2018.

52.     On January 25, 2018, Dr. David Maybee examined Mr. Murphy for fibromyalgia. Mr. Murphy described his severe diffuse pain, severe shortness of breath related to constant chest pain, severe myalgias and arthralgias, malaise, fatigue, and decreased energy. Upon examination, Mr. Murphy presented with an agitated and anxious mood, pressured speech, racing thoughts, and admitted to some obsessions. Dr. Maybee ordered Mr. Murphy to undergo additional testing to rule out sarcoidosis from a pulmonary standpoint.

53.     On March 13, 2018 LaNeshia Patrick examined Mr. Murphy. Mr. Murphy's general activity score was 5, his mood was 4, walking ability 4, sleep 4, appetite 7, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an average of 7 out of 10, his pain interfered with his enjoyment of life 7 out of 10, and his pain interfered with his general activity 7 out of 10. Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at C3-C7, he had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr. Murphy to continue taking 5 mg oxycodone tablets three times per day, which he could increase to once every six hours. In so instructing, Ms. Patrick ensured that Mr. Murphy had a Narcan prescription available in case he suffered an opioid

20

overdose. Ms. Patrick instructed Mr. Murphy to continue gabapentin 600 mg three times per day for nerve pain, and discussed the possible use of cannabidiol ("CBD") oil.

54. On February 9, 2018, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy's general activity score was 4, his mood was 6, walking ability 7, sleep 5, appetite 6, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an average of 8 out of 10, his pain interfered with his enjoyment of life 8 out of 10, and his pain interfered with his general activity 8 out of 10. Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at C3-C7 and had facet joint pain. He had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr. Murphy to continue taking 5 mg oxycodone tablets at least three times per day and noted that he discontinued Cymbalta at his doctors' orders.

55. On March 3, 2018, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy's general activity score was 5, his mood was 4, walking ability 4, sleep 4, appetite 7, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an average of 7 out of 10, his pain interfered with his enjoyment of life 7 out of 10, and his pain interfered with his general activity 7 out of 10. Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at C3-C7, he had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr.

Murphy to continue taking 5 mg oxycodone tablets three times per day, up to six times per day for severe pain.

56.    On April 10, 2018, LaNeshia Patrick examined Mr. Murphy. Mr. Murphy's general activity score was 3, his mood was 5, walking ability 7, sleep 5, appetite 5, and normal work routine score was 0. Mr. Murphy completed a PEG questionnaire. In the week leading up to the examination, Mr. Murphy's pain was an average of 8 out of 10, his pain interfered with his enjoyment of life 8 out of 10, and his pain interfered with his general activity at a "pain as bad as you can imagine" level. Ms. Patrick physically examined Mr. Murphy. He was bilaterally tender to palpation at C3-C7, he had pain with cervical spine extension, left lateral rotation, left lateral flexion, and right lateral flexion. Ms. Patrick instructed Mr. Murphy to continue taking 5 mg oxycodone tablets three times per day, which he could increase to once every six hours. Ms. Patrick instructed Mr. Murphy to continue gabapentin 600 mg three times per day for nerve pain, and discussed the possible use of CBD oil.

57.    On April 16, 2018, Mr. Murphy underwent an MRI of his cervical spine. Dr. Timothy Sloan reviewed the images and confirmed that Mr. Murphy had mild spinal stenosis and mild right neural foraminal narrowing due to disc osteophyte complex at C2-C3, mild spinal stenosis and moderate neural foraminal narrowing bilaterally at C3-C4, mild right neural foraminal narrowing at C4-C5 and C5-C6, mild spinal stenosis and mild neural foraminal narrowing bilaterally at C6-C7, and right paracentral disc herniation at C7-T1 that contacts the exiting right C8 nerve root in the neural foramen, and mild spinal canal narrowing at C7-T1. Under the heading, "Impression" Dr. Sloan wrote that Mr.

Murphy had mild spinal stenosis, postsurgical changes, and right paracentral disc herniation at C7-T1.

58. Mr. Murphy attended two appointments with his family medicine provider, Dr. Staley Moore, on May 8 and 14, 2018. Following the appointments, Dr. Moore completed a functional capacity questionnaire ("FCQ") dated June 5, 2018. Dr. Moore stated that Mr. Murphy's primary diagnosis was neck pain and his prognosis was "poor." Dr. Moore stated he based his opinion on the MRI studies of Mr. Murphy's spine and his clinical findings that Mr. Murphy had limited rotation in his neck. Dr. Moore found that Mr. Murphy was unable to perform his own occupation or any occupation, including work in a full-time sedentary position. Dr. Moore wrote that Mr. Murphy has moderate to severe pain any time he writes or uses a computer with a mouse and/or keyboard, could not lift more than 25 pounds, could sit for one hour and stand/walk for two hours during an eight hour workday, and could perform "no hours" of computer work during an eight hour workday. Dr. Moore described Mr. Murphy's pain as neck pain that travels down both arms, is a 6 out of 10 to a 10 out of 10 in severity with pain medications, and is continuous pain that is often exacerbated. Dr. Moore confirmed that Mr. Murphy has moderate mental effects of pain that constitute a significant handicap with tasks that require sustained attention and concentration. Dr. Moore confirmed that Mr. Murphy's chronic pain caused secondary depression and anxiety. Dr. Moore reviewed the surveillance footage of Mr. Murphy and stated the footage did not support Mr. Murphy's complaints but the footage "did not refute his claim of frequent [pain] exacerbations."

23

59.     On June 19, 2018, Stephen Freeman, PT, examined Mr. Murphy and performed a functional capacity evaluation ("FCE") using MediGraph software. MediGraph software is double peer-reviewed and has been published in the Clinical Journal of Pain and the journal, Spine. MediGraph software does not allow for subjective input from the medical professional that administers the FCE. MediGraph software has been an industry leading software that is accepted and used by physical therapy professionals for over fifteen years. Mr. Freeman's FCE was based upon the Dictionary of Occupational Titles ("DOT") Residual Functional Capacity Battery ("DOT-RFC"). As Mr. Freeman described, the DOT-RFC establishes the degree of the patient's medical impairment, translates the impairment into functional limitations, and determines the patient's work capacity based upon the functional limitations. Mr. Freeman compared his findings against the demand minimal functional capacity ("DMFC") that represents "the least acceptable level of activity" that Mr. Murphy "must possess before returning to work" as an area sales manager according to the DOT. Mr. Freeman stated that the DOT put Mr. Murphy's occupation of "Sales Agent, Business Services" in the "light strength" DOT category. Mr. Freeman administered a battery of clinically-accepted, peer-reviewed tests and compared Mr. Murphy's performance against the DMFC required for Mr. Murphy's DOT occupation and DOT strength category. Mr. Freeman concluded that Mr. Murphy did not have the minimum functional capacity to perform his light strength occupation, as his occupation is defined by the DOT.

60.     On July 11, 2018, Mr. Murphy gave sworn testimony that was video recorded and transcribed. During the interview, Mr. Murphy held his breath, tensed up,

and shifted in his chair, as he was visibly in pain. He had to take a break to stand up, stretch, and move around because sitting down was too painful for him. Mr. Murphy testified about his job requirements and how he missed working at PFG. He discussed his declining health and the numerous treatments he pursued with his medical providers. He showed the numerous medications he takes and discussed the emotional toll that Aetna's termination has taken on him.

61.     On July 18, 2018 Mr. Murphy gave additional sworn testimony in the form of an affidavit. He categorized his days as "partial couch days," "total couch days," and "bed days." He testified that partial couch days are his best days, in which he gets out of bed, feeds himself, moves about his house, possibly completes small errands, and exercises within limitations set by his medical providers. He testified that doing this gives him some sense of accomplishment before he becomes too fatigued from pain and medication, which forces him to lay on the couch for the remainder of the day. He testified that his total couch days are his intermediate days, in which he can get out of bed, make breakfast, and lay on the couch for the majority of the day. He testified that bed days are his worst days, in which his pain is too severe to leave bed. He testified that Aetna's surveillance was indicative of his partial couch days, not his total couch days or bed days. He further testified that he went home and took additional opioid pain medication and nerve medication after completing the errands shown on the surveillance videos and described how he overexerts himself completing such errands.

62.     On July 18, 2018, Mr. Murphy appealed Aetna's decision to terminate his benefits. Mr. Murphy submitted updated medical records from his medical providers and his sworn testimony.

63.     Aetna hired two consultants to review Mr. Murphy's appeal for benefits: Dr. Germaine Rowe, a physical medicine specialist, and Dr. Mustafa Farache, a neurologist. Neither consultant examined Mr. Murphy prior to rendering an opinion regarding his disability claim.

64.     Dr. Rowe reviewed Mr. Murphy's medical records and wrote a report on August 7, 2018. Despite medical evidence to the contrary, Dr. Rowe contended there was a lack of objective examination findings to support the severity of Mr. Murphy's symptoms, a lack of positive test results to support Mr. Murphy's symptoms, and imaging studies that did not reveal the severity of Mr. Murphy's symptoms. Dr. Rowe opined that Aetna's surveillance was not consistent with Mr. Murphy's symptoms, and deferred to neurologists to gauge the disabling effects of Mr. Murphy's neurological pain.

65.     Aetna sent Dr. Rowe's report to Dr. Lopez, Dr. Moore, and Ms. LaNeshia Patrick for comment. All three responded to Aetna's request for comment.

66.     Dr. Lopez responded to Aetna by providing Mr. Freeman's June 19, 2018 FCE report and a new medical record dated October 16, 2018. In the updated medical record, Dr. Lopez explained that she lacked objective evidence regarding Mr. Murphy's neurological impairment, beyond Mr. Murphy's EMG study and reported symptoms. In response to Aetna's inquiry concerning Mr. Murphy's work capacity, Dr. Lopez stated

that she deferred to Mr. Freeman's FCE report, which states that Mr. Murphy does not meet the minimum functional capacity for his own occupation.

67.     Dr. Moore responded to Aetna by resubmitting his FCQ report. His FCQ report states that Mr. Murphy cannot perform his own occupation or any occupation, even full-time sedentary work.

68.     Ms. Patrick responded to Aetna by writing "agree" next to paragraphs in Dr. Rowe's report that she agreed with. She agreed that Mr. Murphy suffered from cervical radiculopathy, chronic neck pain, degeneration of cervical intervertebral discs, cervicogenic headache, chronic pain syndrome, cervical stenosis, lumbar spondylosis, chronic prescription opiate use, cervical neuralgia, fibromyalgia, insomnia due to pain, degenerative joint disease of the cervical and lumbar spine, back pain, radiating head pain, muscle cramps, numbness, and tingling. She also agreed with Dr. Rowe's summaries of her records in which she physically examined and palpated Mr. Murphy and recorded Mr. Murphy's pain and activity levels using ten-point scales, along with other measures using numeric scales. She agreed with Dr. Rowe's summary of the medications she prescribed for Mr. Murphy, which included oxycodone and gabapentin. She agreed with Dr. Rowe's summary of Mr. Murphy's April 16, 2018 cervical spine MRI which showed mild spinal stenosis, postsurgical changes, and right paracentral disc herniation at C7-T1. She agreed with Dr. Rowe's summary of Dr. Moore's records that showed Mr. Murphy's pain was 8 out of 10 in severity, that Mr. Murphy was prescribed lidocaine and Neurontin, and could only sit for one hour, stand or walk for a total of two hours, and was unable to perform computer work. She agreed with Dr. Rowe's summary

27

of Mr. Freeman's FCE evaluation that showed Mr. Murphy's own occupation was light duty and he is "unable to return to work at any capacity."

69.    Dr. Rowe reviewed Dr. Lopez's and Dr. Moore's responses, but did not review Ms. Patrick's response. Dr. Rowe issued an addendum to her report dated October 17, 2018. In the addendum, Dr. Rowe only discussed Dr. Lopez's response and stated that it did not change her previous functionality assessment. Dr. Rowe concluded that Mr. Murphy did not have any disabling restrictions or limitations from a physical medicine perspective.

70.    On October 29, 2018, Aetna's other consultant, Dr. Farache, reviewed Mr. Murphy's medical records and wrote a report. Despite months of medical records to the contrary, Dr. Farache stated "[t]he records provided are very limited" and he "was not provided with any office notes that list the claimant's complaints and exams." Dr. Farache concluded that Aetna's surveillance did not support Mr. Murphy's complaints but "did not refute his claim of frequent exacerbations either." Dr. Farache concluded that Mr. Murphy did not have any disabling restrictions or limitations from a neurological perspective.

71.    On November 14, 2018, Aetna denied Mr. Murphy's appeal and informed him that he had exhausted his appellate remedies under the Disability Policy and he had the right to sue to recover benefits pursuant to ERISA.

72.    Mr. Murphy continues to suffer from head, neck, and back pain, cervical radiculopathy, cervical and thoracic degenerative disc disease, and fibromyalgia. Mr.

Murphy is desperate to find lasting pain relief and is continually working with his medical providers who are supportive of his disability claim.

Claim for Relief<br>(29 U.S.C. § 1132(a)(1)(B) and (g))

73.     The other allegations of this complaint are incorporated by reference.

74.     The Disability Policy is an employee welfare benefit plan within the meaning of ERISA. Mr. Murphy is covered by the Disability Policy.

75.     Aetna failed to provide Mr. Murphy a full and fair review of his claim for benefits under the Disability Policy.

76.     Mr. Murphy is entitled to recover from Aetna long-term disability benefits under the Disability Policy from January 26, 2018 to the date of judgment, with prejudgment interest, and continuing monthly benefits after the date of judgment for as long as he remains eligible under the terms of the Disability Policy.

77.     Mr. Murphy requests an award of attorney's fees and costs against Aetna pursuant to 29 U.S.C. § 1132(g).

Prayer for Relief

Wherefore, having complained of Aetna, Mr. Murphy prays the Court for the following relief:

1.     A judgment that Aetna is obligated under the terms of the Disability Policy to pay Mr. Murphy long-term disability benefits for the period from January 26, 2018 to the date of judgment, with prejudgment interest;

2.     A judgment that Aetna is obligated to pay Mr. Murphy monthly disability

income benefits after the date of judgment for as long as he remains eligible for such

benefits under the terms of the Disability Policy;

3.     An award of attorney's fees and costs against Aetna pursuant to 29 U.S.C. §

1132(g); and

4.     Such other relief as the Court deems just and proper.


1/8/2019                                         /s/ Daniel Watts
Date                                             Daniel Watts
                                                 N.C. State Bar Number 49598
                                                 Andrew Whiteman
                                                 N.C. State Bar Number 9523
                                                 Whiteman Law Firm
                                                 5400 Glenwood Ave., Suite 225
                                                 Raleigh, North Carolina 27612
                                                 Tel: (919) 571-8300
                                                 Fax: (919) 571-1004
                                                 dcw@whiteman-law.com
                                                 aow@whiteman-law.com